**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

PETER R. PATNAUDE,

Plaintiff,

v.

QWEST CORPORATION,

Defendant.

Civil No. 01-1847 (JRT/RLE)

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION TO AMEND COMPLAINT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Judith K. Schermer, SCHERMER LAW OFFICE, 950 Lumber Exchange Building, 10 South Fifth Street, Minneapolis, MN 55402 and Gary A. Ficek, FICEK LAW OFFICE, 15 Broadway, Suite 505, Fargo, ND 58102, for plaintiff.

Judith Williams-Killackey, DORSEY & WHITNEY LLP, Suite 1500, 50 South Sixth Street, Minneapolis, MN 55402, for defendant.

Plaintiff Peter Patnaude ("Patnaude") has sued his former employer, defendant Qwest Corporation ("Qwest"), under section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. Patnaude alleges that Qwest terminated him in order to interfere with his disability benefits under Qwest's ERISA plan. Patnaude seeks restitution and reinstatement into the Qwest long-term disability plan. This matter is now before the Court on Qwest's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and on Patnaude's motion for leave to amend the

FILED SEP - 2 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. ____
DEPUTY CLERK ____

complaint. For the reasons discussed below, the Court will grant Qwest's motion and deny Patnaude's motion.

## BACKGROUND

Patnaude worked at Qwest for 22 years, the last 12 as a cable maintenance technician. In April 1999, he began experiencing tremors in his right hand. In February 2000, Patnaude's doctor diagnosed the tremor as permanent and likely progressive, and stated that he could not perform his job. That same month, Patnaude applied for short-term disability ("STD") benefits under Qwest's employee benefit plan ("Plan"), which is governed by ERISA. Patnaude began receiving STD benefits as of January 30, 2000.

Qwest assigned Joan Boley ("Boley") to handle Patnaude's STD benefits application. In April 2000, Patnaude's doctor provided information regarding his condition, indicating certain work restrictions. On May 1, 2000, Boley imposed medical restrictions upon Patnaude.[1] Patnaude's department at Qwest was instructed to find a job that he could perform with the assigned restrictions. On May 3, Boley informed Patnaude that he could not perform his current position with the assigned restrictions, nor could his department find an appropriate position. Boley told him that Qwest would conduct an 80-day company-wide job search to find a position that met his restrictions.

[1] The restrictions were: no lifting over 50 pounds ground to waist, waist to shoulder, waist to overhead, lifting should not exceed 75% of workday; no working aloft; no fine manipulation with right or left hand; no repetitive wrist/hand movement with right or left hand; no grip/grasp with right or left hand for more than 50% of workday; and no keyboarding with right or left hand. (Schermer Aff. Ex. 7.)

In June 2000, Patnaude was sent to an occupational assessment specialist for a functional capacity examination. The specialist concluded that Patnaude "falls into the category of Medium work . . . ." (Schermer Aff. Ex. 17.) After receiving the results of this exam, on August 8, 2000 Boley issued revised medical restrictions for Patnaude, which were slightly more permissive than the earlier group.[2] On August 11, Boley notified Patnaude that he was still unable to perform his current job under the revised restrictions, and that his department could still not find a position for him. Qwest would thus conduct another 80-day job search.

On August 11, 2000, Boley informed Patnaude that as of August 8 he was no longer eligible for STD benefits, because the medical information showed that he did not meet the Plan's definition of "disabled." Under the Plan, a participant is "disabled" only if he or she is unable to perform **any** job at the company. (Schermer Aff. Ex. 15 at § 1.12; Ex. 14 at Patnaude 00437.) Patnaude appealed this decision on September 18, 2000. The appeal was denied on November 14, 2000.

Qwest assigned Ellie Woolsey ("Woolsey") to help Patnaude with his 80-day job search. The two spoke twice, and Woolsey asked Patnaude what sort of jobs he would consider. Patnaude did not directly answer Woolsey, saying that he wanted to speak with his union president. Patnaude apparently never got back to Woolsey before the 80-day period expired. The collective bargaining agreement governing Patnaude's employment

[2] These restrictions were: no lifting over 50 pounds ground to waist, waist to shoulder, waste to overhead, lifting should not exceed 75% of workday; may perform fine manipulation with right had on an occasional basis, 0 to 2.5 hours per day; may perform fine grip/grasp with right or left had on a frequent basis, 2.5 hours to 5.5 hours per day; may perform keyboarding with right hand on an occasional basis, 0 to 2.5 hours per day. (Schermer Aff. Ex. 16.)

provided that if the company was unable to find a job for him after the 80-day job search, he must be terminated. This is what happened, and Patnaude was terminated on November 11, 2000.

Patnaude filed this action on September 26, 2001, alleging denial of STD benefits and interference with long-term disability ("LTD") benefits and disability pension benefits. Patnaude never applied for LTD benefits. In order to qualify for LTD, a participant must use a full 52 weeks of STD benefits and continue to be disabled. Patnaude did not use up the full 52 weeks of STD benefits, because they were stopped by Boley as of August 8, 2000. Thus, Patnaude did not become eligible for LTD benefits.

In the fall of 2001, after he had begun this lawsuit, Patnaude received a pension application from Qwest. This application could be filed for either a "service" or "disability" pension. Patnaude applied for a disability pension and mailed the application to Qwest. Patnaude never received a response to this application.

On September 21, 2001, Qwest sent Patnaude a packet of materials regarding his retirement benefits. The packet detailed how much money he could expect to receive and when his benefits would commence. It also included a form with which Patnaude could elect to receive his retirement benefit as a lump sum of $53,688.88, or through a variety of annuity packages. Patnaude contends that he did not fill out or return this form. Shortly before Christmas 2001, Patnaude received a check from Qwest in the amount of $42,951.10. The check was not accompanied by a cover letter or any other explanation, and Patnaude had never requested the check.

## ANALYSIS

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

## II. ERISA § 510 Claim

Patnaude's complaint alleges that Qwest violated ERISA § 510 by denying him STD benefits, and by interfering with his attainment of LTD benefits and disability pension benefits. Section 510 of ERISA is an anti-discrimination statute, which provides that it is unlawful to

> discharge, fine, suspend, expel, discipline, [or] discriminate against a participant or beneficiary [of an ERISA plan] for exercising any right to which he is entitled under the provisions of an [ERISA] plan, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140.

Patnaude's allegations under ERISA § 510 are analyzed under the burden-shifting framework articulated by the United States Supreme Court in *McDonnell-Douglass v. Green*, 411 U.S. 792 (1973). To maintain his claim under § 510, Patnaude must first make a prima facie showing that Qwest specifically intended to deny him benefits to which he was entitled. *Jefferson v. Vickers*, 102 F.3d 960, 964 (8th Cir. 1996). If Patnaude can do so, the burden then shifts to Qwest to articulate a legitimate non-discriminatory reason for the denial of benefits. If Qwest presents such a reason, the burden shifts back to Patnaude, who must demonstrate that Qwest's reason is mere pretext for discrimination. Qwest alleges that Patnaude cannot establish a prima facie case, and also claims that Patnaude cannot show Qwest's reason for denying benefits to be pretext.

### A. Prima Facie Case

To establish a prima facie case that Qwest violated ERISA § 510, Patnaude must show: (1) an adverse employment action by Qwest; (2) taken for the specific purpose of interfering (3) with the attainment of any right to which he may become entitled. *Wallin v. Minnesota Dept. of Corrections*, 974 F. Supp. 1234, 1242 (D. Minn. 1997), *aff'd*, 153 F.3d 681 (8th Cir. 1998). Patnaude need not show that the sole reason for the adverse action was to interfere with rights protected by ERISA. Rather, he need only show that the "specific intent" to violate ERISA was a "motivating factor" in Qwest's actions. *Morris v. Winnebago Indus., Inc.*, 950 F. Supp. 918, 925 (N.D. Iowa 1996). *See Regel v. K-Mart Corp.*, 190 F.3d 876, 881 (8th Cir. 1999) (affirming summary judgment for employer where discharged employees produced no evidence that "interference with ERISA-protected benefits was a motivating factor in their discharges").

Patnaude argues that the adverse employment action that he suffered was termination.[3] Qwest contends that Patnaude's § 510 allegations fail because he cannot demonstrate that interference with his rights to disability benefits was a motivating factor

[3] Patnaude's counsel reiterated at oral argument that the adverse action at issue is termination. Nevertheless, much of Patnaude's argument seems to contend that the denial of disability benefits was the adverse employment action. For example, he argues that Qwest cut off his STD benefits because it knew that if he received them for 52 weeks, he would become eligible for LTD benefits. This argument would not succeed because a denial of benefits alone cannot constitute an adverse employment action. ERISA § 510 protects "employment relationships" from disruptions designed to interfere with ERISA benefit plan rights. *Teumer v. General Motors Corp.*, 34 F.3d 542, 544 (7th Cir. 1994). Section 510 "does not protect employees against all employer actions undertaken with an eye toward thwarting the attainment of benefits; only changes in one's **employment status** cannot stem from benefit-based motivations." *Id.* (emphasis original). *See West v. Butler*, 621 F.2d 240, 245-46 (6th Cir. 1980) (holding that an action is "adverse" for purposes of § 510 if it "affect[s] the individual's employment relationship in some substantial way").

behind the decision to terminate him. Qwest argues that Patnaude was terminated pursuant to the collective bargaining agreement because there was no work at the company that he could perform.

Patnaude argues that he was terminated because Qwest sought to deny him a disability pension. He alleges that Qwest knew that if he was terminated as "non-disabled," he would not be eligible for such a pension. Patnaude presents no evidence to support this claim, and much of his argument on this point focuses on demonstrating that Qwest's articulated reasons for terminating him were pretext. However, before the analysis can even shift to pretext, Patnaude must present some evidence – beyond mere allegations – that interference with his benefits was a motivating factor in Qwest's decision to fire him. The Court finds that Patnaude has presented no such evidence, and therefore concludes that he has not demonstrated a prima facie case under ERISA § 510.

**B. Pretext**

Even if Patnaude was able to make out a prima facie claim of discrimination, the Court finds that he still has not shown that Qwest's articulated reasons for terminating him are pretext. Qwest asserts that it terminated Patnaude for the legitimate nondiscriminatory reason that it could not find a job for him in the company.

First, Patnaude argues that Boley's explanation for terminating STD Benefits was "devoid of reason." Boley testified that company policy required her to stop STD benefits for any participant who was placed under permanent medical restrictions. Patnaude claims that this reason is pretext, because no such policy existed. This is not true. An examination of the record demonstrates that Qwest did have such a policy, and

that Boley noted it in her deposition testimony. The relevant policy is in the record, in Section 4.12 of Qwest's Disability Plan. This section, entitled "Duration of STD Payments," provides in relevant part:

> Payments of STD benefits under the plan shall continue until one of the following occurs: (a) the Participant is certified by Health Services as able to return to work full-time or their current scheduled hours either with our without Medical Restrictions . . . .

(Schermer Aff. Ex. 15 § 4.12.) Boley testified that under this policy, if an employee "is able to work in a modified capacity, meaning with work restrictions, the short-term disability ceases." (Schermer Aff. Ex. 3 ("Boley Dep.") at 45-46.) Boley further testified that because she determined that Patnaude was able to return to work in a modified capacity, under Plan regulations he was not "disabled," and therefore not eligible for STD benefits. (*See id.* at 46.) The record supports this determination, and shows that Boley believed, on the basis of the available medical evidence, that Patnaude was not disabled because could perform some job at the company. For example, the June 2000 functional capacity exam showed that Patnaude retained some abilities, and Boley modified Patnaude's work restrictions accordingly. (*See* Schermer Aff. Ex. 17-18.) The record thus refutes Patnaude's allegations, and demonstrates that Boley's testimony and the Plan itself support Qwest's legitimate non-discriminatory reason for terminating Patnaude.

Patnaude also challenges Qwest's statement, made by Boley, that there was insufficient medical documentation to show that he was disabled. Patnaude claims that this explanation is pretext, because Boley later testified that the record contained enough medical evidence to make her decision. Patnaude claims that these statements are inconsistent, and show that Qwest's reason is pretextual.

The denial-of-benefits letter that Boley sent to Patnaude on August 11, 2000 stated that "[d]ocumentation from your Provider must . . . be consistent with your **inability to perform any job** within the Company (including any job in which duties may be modified)," and that the "medical information provided is insufficient to substantiate ongoing disability." (Schermer Aff. Ex. 19 (emphasis added).) Based on this letter, Patnaude concludes that the "the reason [for] . . . cancellation of the benefit . . . was that there was not enough medical documentation . . . ." (Pl. Mem. at 15.) Patnaude finds this "reason" to be "unworthy of credence." (Pl. Mem. at 15.) During Boley's deposition, plaintiff's counsel asked what additional documentation Boley needed to make her determination. Boley responded that no more information was necessary for Patnaude's case. Patnaude argues that this reveals Boley's earlier reason for denial of benefits to be pretext. However, Patnaude places improper emphasis on the issue of "sufficiency," wrongly implying that his benefits were denied simply because he did not provide documentation. This mischaracterizes Boley's testimony. An examination of the transcript demonstrates that Boley made her decision because the medical records did not prove that Patnaude was "disabled" under Qwest's definition.[4] Boley testified that no

---

[4] This is illustrated by these portions of Boley's testimony:

**Q:** Was there any more medical information needed to document the tremors that Peter Patnaude had in his right hand when he attempted to perform fine manipulation with his right hand?

**A:** It was well documented.

**Q:** So you didn't need more medical information on that?

**A:** Not on that case.

(Footnote continued on next page.)

amount of information would change her determination, because the evidence simply showed that he did not fit the criteria. Thus, her determination did not rest on the volume of medical evidence, but rather on what that evidence showed.

These allegations of pretext are centered around Patnaude's disagreement with Boley's determination that he was not "disabled" under the Plan. As noted above, the record refutes Patnaude's contention that these reasons are pretextual. It is important to remember, however, that the Court's role is limited to the question of pretext. The Court may not second-guess Qwest's determination that Patnaude was not disabled. *See Regel*

(Footnote continued.)

**Q:** What did you need more medical information on?

**A:** Medical information provided is insufficient to substantiate disability. And that's based on the definition of the disability plan.

**Q:** Right. So tell me what other medical information you felt you needed to substantiate disability.

. . .

**A:** I believe that the information that was provided gave a good idea of what [Patnaude] could do, and that he could do it – do work in a modified capacity.

. . .

**Q:** . . . [T]here's just one thing I want to make sure that I'm absolutely clear on, and that is what medical information do you feel you would have had to have in order to continue to pay Peter Patnaude short-term disability benefits?

. . .

**A:** I would have to have medical information that provided objective medical findings that he was unable to perform the job based on the definition of disability.

(Boley Dep. at 72, 76.)

*v. K-Mart Corp.*, 190 F.3d 876, 880 (8th Cir. 1999) ("[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgment made by employers, except to the extent that those judgments involve intentional discrimination."). Boley's determination would be reviewable if Patnaude had sued to recover benefits under § 502(a)(1)(B) of ERISA, but he has chosen not to do so.

Next, Patnaude contends that the timing of his incapacity and his illness coincided, and therefore suggest that Qwest's reason for firing him was pretext. In support, Patnaude cites *Smith v. Ameritech*, 129 F.3d 857 (6th Cir. 1997). *Smith* cites to Eighth Circuit law on ERISA § 510, and is factually very similar to the present case. However, *Smith* does not support Patnaude's argument. *Smith* involved a system of short-term and long-term benefits much like those in this case, where an employee had to receive 52 weeks of short-term disability before becoming eligible for long-term benefits. *See id.* at 860. There, the Sixth Circuit affirmed a grant of summary judgment on a plaintiff's § 510 claim, where the plaintiff's short-term benefits were stopped only weeks before becoming eligible for long-term benefits, and where the plaintiff was fired only two days after filing a union grievance regarding denial of benefits. *Id.* at 862, 865. The court ruled that the temporal proximity between the denial of benefits, the union grievance, and the termination did not support an inference of intentional interference with benefits. *Id.* at 865-66. This was because the plaintiff did not make a showing that he was "disabled" under the short-term and long-term plans and was entitled to benefits at the time his short-term benefits were terminated. *Id.*

The same reasoning applies here. Qwest determined on August 8, 2000 that Patnaude was not disabled under the Plan, thus cutting off his STD payments and making him ineligible for LTD benefits. He was terminated three months later. By that time, it was clear that he was not eligible for disability benefits. As in *Smith*, Patnaude has not demonstrated that he was "disabled" under the Plan definition. Because he cannot show that he was eligible for STD benefits when they were discontinued, his termination (and alleged interference with LTD benefits) cannot have been designed to interfere with benefits for which he was not even eligible.[5]

Finally, Patnaude argues that Qwest did not follow its own policies, and that this demonstrates pretext. Patnaude first argues that Qwest did not follow its policy in determining that he was disabled, contending that he "appears to meet the company's definition of disability . . . ." (Pl. Br. at 16.) As noted above, the question of whether Patnaude was disabled under the Plan is not before the Court. Even if the Court agreed that Patnaude was disabled under the plan, this would not be relevant to his § 510 claim. *See Godfrey v. Bellsouth Telecommunications, Inc.*, 89 F.3d 755, 759 (11th Cir. 1996) ("The employer does not violate ERISA Section 510 just because a court later determines that the employer's good faith disability determination was wrong.")

Patnaude also claims that "the record abounds" with violations of company policy, but he can point to only one such violation, Qwest's sending Patnaude the check for $42,951.10 in December 2001. (Pl. Br. at 16.) Patnaude asserts that issuance of the

---

[5] The Court also notes that the distance in time – three months – is much greater here than in *Smith*.

check "certainly was not supported by any company policy." (*Id.* at 17.) However, he does not explain nor provide evidence of how it violated any policy, nor does he rebut Qwest's explanation of this check.

Therefore, based on the discussion above, the Court finds that even if Patnaude was able to demonstrate a prima facie case under ERISA § 510, he has not met his burden of showing that Qwest's reason for firing him was pretext. For this reason, Qwest is entitled to summary judgment.

## III. Exhaustion of Administrative Remedies

Qwest argues that even if Patnaude could succeed under the burden-shifting analysis, it would still be entitled to summary judgment because Patnaude did not exhaust his administrative remedies under the Qwest plan. Courts are split on whether exhaustion is required on § 510 claims generally. *See Burds v. Union Pacific Corp.*, 223 F.3d 814, 817 (8th Cir. 2000) (citing conflicting cases). The Eighth Circuit has not taken sides in this dispute, but it has held that when resolution of a § 510 claim "turns on an interpretation of the ERISA plan at issue," a district court has discretion to require plaintiffs to exhaust their administrative remedies.

The Court finds that resolution of Patnaude's § 510 claim does not turn on an interpretation of the Qwest Plan. The only possible interpretation of the Plan related to this case is whether Patnaude fits the Plan's definition of "disabled." As the Court has already stated, however, that issue is not before the Court. This case is limited to the issue of whether Qwest's termination of Patnaude was done with the specific intent to interfere with his enjoyment of ERISA benefits. This question involves no interpretation

of the Plan itself. Therefore, the Court finds that, pursuant to *Burds*, exhaustion of remedies cannot be required.

**IV. Plaintiff's Motion to Amend Complaint to Add Breach of Fiduciary Duty Claim**

During the briefing and argument on this motion, Patnaude requested permission to amend his complaint to include a claim for breach of fiduciary duty under ERISA § 409, 20 U.S.C. § 1109. The Court will consider this request, even though Patnaude has not filed a formal motion for leave to amend, nor has he submitted a proposed amended complaint.

Rule 15(a) of the Federal Rules of Civil Procedure mandates that leave to amend be granted liberally, whenever "justice so requires." *See* Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998). Such leave should not be granted, however, if the party opposing amendment can show prejudice, that the amendment was brought in bad faith, would be futile, or cause undue delay. *Foman*, 371 U.S. at 182; *Bell*, 160 F.3d at 454.

Patnaude bases his request on Qwest's assertion that the $42,951.10 check received in December 2001 was a lump sum distribution of Patnaude's service pension. Patnaude claims that he never authorized such a distribution, and the check therefore represents a breach of Qwest's fiduciary duty to the retirement plan.

There are several reasons why Patnaude may not amend his complaint. First, his request is untimely. The Court's scheduling order called for all motions to amend to be filed and heard by April 15, 2002. (*See* Docket No. 5.) Under Rule 16(b) of the Federal Rules of Civil Procedure, this order cannot be changed absent "a showing of good cause."

Fed. R. Civ. P. 16(b). The Court finds that Patnaude has not demonstrated good cause to permit an amendment at this late date. Patnaude claims that the check represents a fiduciary breach,[6] but he presents no evidence to challenge Qwest's explanation for the check. Qwest contends that this check constituted a lump sum payment for Patnaude's vested service pension, not any payment of disability benefits. In support, Qwest produces Patnaude's tax returns from 2000 and 2001. In 2000, when Patnaude was receiving STD benefit payments, he included them as wages. (Williams Aff. Ex. K.) In 2001, when Patnaude received the check that he ostensibly believed was payment of owed STD benefits, he instead listed it under "pensions and annuities." (Williams Aff. Ex. L.) This suggests that, as early as April 2001, Patnaude knew the check was in fact a retirement pension lump sum payment. Based on this evidence, there is no reason that Patnaude could not have alleged fiduciary breach in his original complaint. Because the "function of Rule 15(a) is to enable a party to assert matters . . . that were unknown to him at the time he interposed his original complaint or answer," the Court finds that Patnaude should not be permitted to amend his complaint. *Trustees of Graphic Communications Int'l Union Local 229 Health & Welfare Fund v. Rapid Copy, Inc.*, 620 F. Supp. 202, 206-07 (D. Minn. 1985) (quoting 6 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure: Federal Rules of Civil Procedure* § 1473 (1972)).

The Court also finds that it would be unjust to permit an amendment now because doing so would cause unfair prejudice to Qwest. Qwest notes that it has never had notice

---

[6] Patnaude has argued variously that he did not know what the check was for, (Schermer Aff. Ex. 1 at 191-92), and that his "rough calculation" led him to believe that the check was for the unpaid short-term and long-term disability benefits for which he was suing. (Pl. Mem. at 11.)

of a breach of fiduciary duty claim, and it has had no opportunity to conduct discovery on the claim. The Court agrees, and finds that this is another reason to deny Patnaude leave to amend his complaint.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion to Amend Complaint is **DENIED**;

2. Defendant's Motion for Summary Judgment [Docket No. 16] is **GRANTED**; and

3. Plaintiffs' Complaint is **DISMISSED** with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: September 2, 2003
at Minneapolis, Minnesota.

John R. Tunheim
JOHN R. TUNHEIM
United States District Judge

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd